Good morning. I'm John Waneke, and I represent Jackie Jura, plaintiff appellant in this case. And I'll request a couple of minutes for rebuttal. OK. Jackie Jura's career as an attorney was ruined when she was wrongfully discharged from her position as Deputy Prosecuting Attorney for the County of Maui. She was not able to find employment as an attorney because it was alleged that she was discharged for poor performance and bad behavior. And what this case is about is an attempt to clear her name and basically do her justice. Jackie Jura had excellent reviews and had a very good opinion or reputation as an attorney up until the point where the situation in the prosecutor's office interfered and wrongful allegations of her poor performance were then asserted. Can we fast forward to the end of the drama, at least in the office? As I read the record, there were two negative reviews by judges of Ms. Jura's performance. And I'm trying to figure out whether your position is that those negative reviews wouldn't ordinarily have led to her dismissal, and therefore the dismissal was pretextual, or whether you take the position that there weren't really those negative reviews. I would take the position that one of the reviews was not really a negative review. Well, they're certainly not complementary. Well, first of all, one of them is pretty bad. Right. The other one is not as bad, is the way I guess I'd put it. Right. Well, the review that's pretty bad is the review by Judge Polak, Simone Polak, and there's good explanation for that. But let me ask the question a little differently and see, to get a little. Let's assume that there had been none of this other stuff that you allege, and you'd gotten to the point of review of Ms. Jura's performance, and these two reviews came in. Do you contest that on the basis of those two reviews, the office could terminate her? Yes, we contest that on the basis of those reviews, the office could terminate her. Were there other similarly situated persons? In other words, were you able to present evidence that other attorneys had received analogous reviews by the judges and were nevertheless not terminated? Well, the reviews were received for other attorneys at the same time as comments about Jackie Jura, and certainly her performance wasn't the worst among those reviews. So did you present that, and where was that in the record? Because I know that, let's see, so Murakami resigned, Ms. Murakami, and then so who else received these negative reviews by judges and were not terminated, and where is that in the record? I don't believe, I'm not sure that the reviews are in fact in the record because the issues on appeal and the way the case was decided in the district court didn't at all make reference to these reviews. The court didn't reach those issues. The court didn't reach the issue that was initially the issue in the summary judgment motion, which was that, well, there was this sufficient basis to terminate Jackie Jura regardless of anything else because there were some judges. The court simply said, well, Jackie Jura didn't assert prima facie case because the issue was jealousy and not sexual harassment, et cetera. So if we were to, so actually, I'm not sure. So you're not, are you contending that this, that these reviews, I'm still asking the same question I started with. Let's assume no sexual harassment. Let's assume no Title VII violation otherwise. Are you contending that these reviews are not sufficient to warrant termination? Yes, in the context of this case, they're not sufficient. Well, but that's not the question I'm asking. I guess the question I'm asking is for an ordinary employee, could you be fired for these reviews? We have to here be very clear what, which review we're talking about because Even one of them. Let's take the terrible review. Let's assume an assistant prosecutor and somebody in this office who has no claim of sexual harassment. Would this review be cause for firing? Again, the question is what is considered here to be the review? Because we don't have here any formal review. What is in the record, but I don't think it's even on the record, an appeal, are notes from somebody who supposedly talked to that judge on the phone. So it's essentially hearsay. So your answer is no? Yeah, the answer is. Your answer is that somebody couldn't be fired because somebody in the office called up one of the judges and said how was this person in your court? And the judge said terrible. I thought they were written. Yeah, I think they were too, but I'm just trying to. The declarations, they're not hearsay. They said so-and-so called me up, Rivera called me, and here's what I told them. Right, there are declarations and there are certain statements made about what was said at the time. And with respect to Judge Pollack's comments, and again there's a question here whether this material could even be presented because I think the judiciary took the position that judges shouldn't really be making these types of evaluations or statements where we attempted to obtain. Let me try this again because we're not connecting and I'm trying to. If I assume for a moment that poor performance as documented by these judges' statements was an appropriate reason to terminate a prosecutor, then it seems to me with that assumption, and I'm not asking you to make it, then you'd have to show that the real reason that she was terminated was not these reviews, but rather these were a pretext because she was terminated because of the things that you allege here. And so I'm getting – I get back to Judge Akuta's question, which is that was there any evidence in this record that other people with these kinds of reviews would not be terminated? No, in terms of other people with these kinds of reviews, no. I don't think that these kinds of reviews were presented or considered. Okay, so now let's go back to the premise of my question, and I guess the premise of your case, which is that these were not the real reason she was terminated. The real reason she was terminated was because of something else. What's your evidence that that was the real reason she was terminated? With respect to termination, the real reason for termination is retaliation for her reporting of sexual harassment and discrimination against her and another. I understand that that's – I'm just following up on Judge Hurwitz's questions. I understand that you say that is the real reason. What's your evidence that that's the real reason? Right. What happened here is, first of all, she was terminated about two weeks after she made those statements. She was taken off the schedule about four days after she made those statements. And she – we know that the investigator who was investigating the matter was removed from the case when he tried to report or where he felt that there was discrimination and that this person shouldn't be terminated. Robert Rivera was actually taken out of the case, and another investigator – Help me with the timeline. Okay, the contention is that she's been retaliated against for testifying and helping to pursue a complaint against her boss. Is that right so far? Right. Okay, so when does she do those actions that, in your view, prompt the retaliation? All right. The first sort of step in this process was the complaint that was made by Timothy Tate on October 29th to Robert Rivera as the EEOC representative saying that these two deputy prosecutors were sexually harassed by Mary Cosgarten, were discriminated, and were in danger of actually losing their jobs because Mary Cosgarten was basically infatuated with Mr. Tate. And any woman who came near Mr. Tate would automatically be an object of her aggression. That was the first step. And then what happened was that Robert Rivera asserted or informed the management of that complaint, of that allegation, and Benjamin Acob then charged Robert Rivera with investigation. So Robert Rivera conducted an interview of Jackie Jura on November 12th, 2007. And in that interview, Jackie Jura made statements that confirmed the sexual harassment but also expressed her concern about being retaliated. So she didn't really want the charges to be. Do we know precisely when Rivera, because it's the same Rivera, makes the telephone calls to these judges? The two declarations say on or about November, but they don't give a precise date. Do we have other evidence that tells us when the phone calls were made from Rivera to these judges? The phone calls were made in the afternoon of November 12th. So it was after that interview. And so when was Jura removed from the work schedule? What was the date of that? I believe that what happened is that there was a second sort of act to this, which is that Rivera then, based upon everything that he saw, tells Acob that he doesn't believe there is discrimination. He doesn't believe that a deputy prosecutor should be removed. And so he's then being demoted and removed from his position as an EEOC officer. And Mr. Acob installs his friend Wayne Steele, an administrator, not an attorney. Of course, Rivera is an attorney, into that position and charges him with the investigation. So there was a second interview of Jackie Jura, or the second meeting with an EEOC investigator, Wayne Steele. Just stop for a second because you're losing me here. Rivera says, I don't find discrimination, correct? No, I'm sorry. Rivera said that he felt there was discrimination. You said he didn't find discrimination. Yes. I'm sorry. I misspoke here. He did feel that there was discrimination. He felt that they were harassed. He felt that they shouldn't be terminated. I have misspoken. I apologize. And that is in where in the record? In his declaration? It is in his deposition. Deposition. I don't think he gave a declaration, but it's in his deposition. And then he got the reports from these judges, and then Steele interviewed Jura, and then Jura was taken off schedule. So she was taken off schedule after these reports from the judges? Right. What happened was that after that second, she was taken off the schedule after her meeting with Wayne Steele, which took place. And that occurred after the report from the judges. Right. I believe that occurred after Rivera's conversation with the judges on the phone. Okay. And this takes me back a minute. This takes me back to the question. You have a Title VII retaliation claim here. What you're saying is she was fired because she complained. And as you walk through the timeline, the judges' reviews seem to come at the very end of the timeline, and that's when she gets fired. So my question is still how does this previous stuff show pretext? First of all, the judges' reviews were commissioned, so to speak, were requested in order to gather evidence against her. It was the product of this investigation and this attempt to, that process where the county was seeking basically ways to terminate her. And of course, that's... They wouldn't have talked to the judges but for her. But for their intent to terminate her or her complaint. But it was Rivera who talked to the judges, and Rivera's not working for the defendants, correct? At the time, he worked for the defendants, but he seemed to be more objective, and he looked at things the way they were, not the way that Cosgarten and Acab wanted. So help me understand the relationship in the office between Rivera and the defendants. He's a deputy prosecuting attorney. Is he parallel with, subordinate to, superior to? How does he relate to the defendants? At the time, he was the chief, I think they call it. He was in charge of a civil litigation division, so he was about the same level of responsibility as Marie Cosgarten, who was in charge of the criminal section. And he was also EEOC officer, designated officially EEOC officer. Of course, Jackie Jura was subordinate of Marie Cosgarten. Timothy Tate was another, basically at the time, equal to Rivera and Cosgarten as head of another section, the drug investigation section, something of that nature. After he was, of course, Wayne, I'm sorry, and then Wayne Steele was an administrative assistant to Ben Acab. Rivera was then demoted from his position, was removed from his position as an EEOC officer and demoted to a regular deputy prosecuting attorney. Eventually, he was terminated. He filed an EEOC complaint, and that was some time later. Then later was reinstated. He's now the first deputy prosecutor in line to become the head prosecutor. Okay. We've taken you well over time. Let's hear from the other side, and then we'll give you a chance to respond. Thank you. Good morning. May it please the Court. Richard B. Ross for Defendants, County of Maui, and Benjamin McCobb. I'm going to be taking 10 minutes, and Mr. Cox will be taking 5 minutes. Okay. Good luck. Thank you. I'd like to start by addressing a couple of issues that came up while plaintiff's counsel was arguing. First, I'd like to direct the Court to page 376 of the exertive record regarding Mr. Rivera's feelings about what was going on. I believe Mr. Winicki said that Mr. Rivera believed that this was discrimination. That's not true. Mr. Rivera on page 376 in his deposition testifies, I considered it giving an appearance of impropriety. I didn't consider it being a direct violation of EEOC guidelines, but I thought it would give at least an appearance of impropriety. So Mr. Rivera thought this looked bad for there to be these personal disputes between the prosecutors, but he never took it as something that was actually a violation of EEOC guidelines or discriminatory. The other point I'd like to make that came up earlier to your question, Judge Hurwitz, all the prosecuting attorneys serve at the pleasure of the head prosecutor. That's in the county charter, which is attached in the appendix to the county's brief. So it's at will employment.     And I don't want to expose the subject of their questions, but I mean that, I'm in the scene. Scalia. But that doesn't mean you get to fire somebody for a bad reason. No, no. Absolutely not. You can't just fire someone for a discriminatory reason, certainly. But here we just work it again. You  HIS position was she was terminated because she wasn't good at her job?     I don't know if you have any evidence, because I don't think you have any evidence to, there are enough evidence to go to trial. Let me give you the contrary evidence and see how you deal with it. She had complained. She had a generally positive review from her immediate superior. And the, and the, my question, so I'm interested in how the judge's negative reviews come into that process.     I mean, I don't know. I mean, I don't know. I mean, I don't know.   That is how we do it in this case. Tell me how this occurs. Benjamin McCobe, the prosecuting attorney at the time had Mr. Rivera ask the district court judges about the performance of all the deputies assigned to the district court. That's in the statute. Without regard to whether or not a complaint had been filed? Correct. It was standard for all of them. And that's in the statute. Let me ask you this then, and I confess. There is some of this record that I have not yet read.  call to a lawyer would be very, very restrictive. I don't believe so. Well, that's very suspicious. I mean, if it's routine, you can do it for everybody. And the first time these two judges are ever called is when we're right in the middle of a discrimination complaint. Well, Ms. Jura had only been employed for less than a year at that point, so I don't know. Do you have it in the record, the dates or the regularity of the calls that are made          I don't. I don't. I don't. I don't. I don't. I don't. I don't. I don't. I don't. I don't. I don't.      I don't. I don't. I don't. I don't believe so. And why not? What is in the record is in Mr. Cobb's declaration saying he has Mr. Rivera contact the judges about all the prosecutor's data. So when you're telling me that it's routine or regular for these calls to be made to the judges to evaluate the deputy prosecutors, what's in the record to support what you just said? Other than Mr. Cobb's declaration saying he had it done by Robert Rivera for everyone. I don't believe. Well, for everyone on a regular basis, is there a scheduled time or is it? I don't believe it was. You know, I don't know. You see, why read that declaration saying whenever I want to check up on a deputy prosecutor, I have Mr. Rivera call the judges? It could be that. And they're saying, well, the reason you checked up on me was because I filed a complaint. And even if the reason he checked up on her was because she filed a complaint, and I don't think there's any evidence to support that, but even if that was the case and he gets this result of she's doing a bad job according to two judges, I believe it's still appropriate for him to be able to take action in that circumstance. Well, you know, there's a very famous old labor law case where there's a guy who comes into the shop routinely drunk. He's the worst possible employee. But they tolerate him until one day he becomes a labor organizer. And then they fire him for drunkenness. And the NLRB says, nah, you can't do that because you tolerated him. And it's very clear that the only reason you fired him, even though he was previously fireable for his bad performance, the only reason you fired him is because he became a labor organizer. So the fact that she was a poor performer and could have been filed on that basis doesn't necessarily mean that this was not a retaliatory firing. Well, true. What I would say, though, is to get to retaliation, she has to engage in protected activity. Let's go back to that. This one's a tricky question as to whether or not it's protected activity. First question is, was the questioning by her boss about her sexual relations, or at least intimate or friendly or whatever the relations might have been with Kate, was that sexual harassment? But the real question is not that. The real question is, when she said bad things about the boss, did she have a reasonable belief that she was reporting actionable behavior? Correct? Correct. That is the question. So let's assume that she had a reasonable belief that she was reporting actionable behavior. So she's now protected against retaliation. If she never even ---- And at that point, bingo, all of a sudden we get this investigation and we get these kind of a skimpy record as to how regularly these calls might have been made for others, I'm beginning to smell a jury question. If you find protected activity, then it becomes a closer question, I think. Well, why is it not protected activity when she says, my boss did the following things that I think violated Title VII? Why is that not protected activity in the sense that she cannot be retaliated against for saying that? Because what she was alleging was not based on sex. What she was alleging was based on personal animosity. Let's assume that's right. Let's assume that she had no valid complaint. But she made a complaint. And she consents, she says, I was retaliated against for making a complaint. The complaint may turn out after investigation to have no validity at all. Why isn't that enough to create a jury question? And let me supplement the question, and Judge Sherwood's come back away from it. My understanding of the law is if she has a reasonable belief that the behavior she's complaining of violates Title VII. That's what I meant. It doesn't matter whether it actually violated Title VII. She's protected. You're absolutely right in that statement. If she had a reasonable belief. Now, I'm going to argue to you that she did not have a reasonable belief. Is there any case on point that would say that she didn't? Yes. Because normally we're looking at the cases. Right. The most on point case is McConnell v. West Point Stevens. Which is an unpublished 11th Circuit case. There are other cases which we cited. The Cooper v. Potter case. Blackshear. Those are district court cases. I think the Sukar v. Dade County case. But in our circuit there is no case. And there isn't a circuit wide other circuits other than this unpublished 11th Circuit case. Is that right? There are no 9th Circuit cases on that issue. What I will say is that every case that's considered the issue says personal animosity is not discrimination under Title VII. This is kind of an odd personal animosity. And I'm not here arguing that this is necessarily a violation of Title VII. But it's personal animosity according to her based upon a sort of sexual jealousy. She's treating, at least according to Ms. Jura, she's treating her badly and the other woman in the office badly when they are having some kind of relationship with Tate and the boss wants the relationship with Tate for herself. Now, so that's not just personal animosity. That's personal animosity coming out of some form of sexual jealousy. Now, that may or may not be Title VII. But it's close enough that I have trouble seeing how someone in Ms. Jura's position would be unreasonable in thinking that it's a Title VII violation. Well, I would just say that Title VII exists to prevent sexual discrimination, among other things. It also exists to encourage reasonable complaints or complaints supported by reasonable belief. Absolutely. And plaintiff has argued that the 11th Circuit, where McConnell was assigned, has a different take on Title VII. I don't think that's true. We've had cases from the 11th Circuit President which talks about the prophylactic purposes of Title VII. So I don't think McConnell or Sue Carr were decided under different schemes than are applicable in the 9th Circuit. But get back to Judge Fletcher's question. Let's assume for a moment that we as a matter of law, as a panel, would find that these actions weren't sexually motivated. Why wouldn't Ms. Jura at least have a reasonable belief in making the complaint that they were? Well, the case is a ---- She's not reading the cases. Sure. We're reading the cases. And Judge Acuda says we've read the cases and we can't find any 9th Circuit law on the point. So why wouldn't Ms. Jura be reasonable in thinking that her complaint related to Title VII protected activity? Well, part of the question of whether or not it's a reasonable belief has to look at the preexisting case law. That's the Drinkwater case, which is out of the 3rd Circuit, which is signed in our brief, says that. Patterson, which is an IAHO Supreme Court case, also says that. So I think you have to look at how the law exists under Title VII at the time this is being ---- this complaint is being made to determine whether or not it's reasonable. I don't know whether you intend to address this or whether your co-counsel does, so let me ask the question and you can pass it off if you want. Are you contending in this case that there was some ---- even if there was a problem, there was a break in the chain, as you will, that even if we did something wrong, by the time we got to the end of it, having heard from the judges twice, we were entitled to terminate her? I think the evaluations from the judges and the information that Judge Liu and Judge Pollack provided have been a code. Standing alone is enough to ---- You had a legitimate nondiscriminatory reason, and did the other side present evidence of pretext? As far as I'm concerned, there's no evidence of pretext. It's not really argued in Plaintiff's papers below, and I don't see the ---- Plaintiff claims this is all coming from Marie Cosgarden. She never connects up why Benekoe would be interested in helping Cosgarden with this personal vendetta, so I just don't see the pretext there. Before I completely run out of time, I would like to address briefly Plaintiff's ---- If you want to save time for co-counsel, you are. You're already over time. I'm sorry. The one thing I'd like to say on the ADA claim is Plaintiff failed to ---- Right. She never defended against it. She never addressed it as someone ---- You may be in trouble on some of the other stuff, but you're not in trouble on that one, at least in my view. All right. Thank you. You tried to save, unsuccessfully tried to save five minutes, but we will provide five minutes. Okay. If you put five minutes on the clock, please, Estella. Thank you. Thank you, Your Honor. Your Honor, may it please the Court, Joachim Cox on behalf of Marie Cosgarden. Kamal Haake is at counsel's table with me on the briefs. Your Honor, in the time that I have, I want to address in particular the issues related to Marie Cosgarden, specifically that she has the qualified immunity in place under the McNally case here in the State of Hawaii. And in that case, it identifies that it is the plaintiff's burden, Ms. Jackie Jura's burden, to show that there was a malice on the part of Ms. Cosgarden that would somehow remove my client, Ms. Cosgarden, from the qualified immunity. In this case, let's assume that all we have is the Title VII retaliation claim in front of us, which I think is probably all that was defended against below, the last point your co-counsel was making. What's the evidence that, or lack of it, that Ms. Cosgarden retaliated? Well, that goes right to the point, Your Honor. There isn't any evidence in the retaliation fashion. And it then also supposes that there's not. I'm assuming for a moment that there's evidence that she created a hostile work environment, which is not an issue in front of us. I'm not asking you to concede that. My question is, what's the evidence that she played any role in the termination? The best evidence that has been put forward by Ms. Jura in the matter below, and at this point right now, is that Ms. Cosgarden was directed and then complied with the direction from Mr. Akobe to actually change the schedule. The schedule for all of the deputies changed the calendar as to how they were applied. And in that change, Ms. Jura was taken off of the schedule. That's it. And as we argued below and we put forward beginning on page 37 of our briefs before this court, the timeline that you have the meetings. The meetings occur with Mr. Rivera and then Mr. Steele. Those occur in the early November time period going through to then the November 23rd time period. That's when the meetings would occur. And assuming then for the moment of this argument, then that those are that protected activity within the retaliation element. Assuming that that actually is a protected activity, you would then of course have to have an adverse employment action that would occur after that. And that's what we've argued below and we argue here again. And Judge, to your point, the only activity that occurs after that point in regards to Ms. Cosgarden is this issue related to the change of the schedule. And as Chief Judge Mulway, when we went through this discussion in the arguments below on the motion for summary judgment, Chief Judge Mulway acknowledged or accepted, as we've identified, that all Marie Cosgarden was doing was at the direction of Mr. Acobe and arguably to be sued for being in that position of simply going forward with it. And then the record is also clear that Marie Cosgarden had absolutely no involvement in the decision to terminate. And that's identified by Mr. Acobe in his declaration where he specifically says, Marie Cosgarden had no involvement with the decision to terminate. Even more than that, Your Honor, as the actual process of Mr. Acobe meeting with Ms. Jura and then firing her, Ms. Cosgarden was actually out of the office during that time period. She was on a medical leave beginning on the 28th of November and then lasted throughout the entire month of December. And what was the date when Ms. Jura was terminated? She was terminated on the 7th of December, 2007. And the evidence before the court below and at this point not refuted by Ms. Jura is that, in fact, Ms. Cosgarden had no idea until weeks afterwards that, in fact, Ms. Jura had been terminated. So, Your Honor, the points that we really stress on behalf of Ms. Cosgarden in particular, obviously this whole issue as to the jealousy within the office, the interpersonal issues out there, we're not dismissing those as actually we don't even really accept them to be true, but for the purposes of the motion below, fine, okay. But under the McConnell case, as well as all of the other cases, and my co-counsel has identified that there simply are no cases that identify this interpersonal relationship triggers a Title VII. It may be unwelcome. It may be boorish. It is not a Title VII claim. The Ninth Circuit has not reached that issue yet. And so here you are with that. But then in regards to Ms. Cosgarden, it really is perhaps like you identified, Judge, in this chain of events where if we're moving on beyond the sexual harassment, hostile work environment, then you've got to go forward with the retaliation claim. And as to that retaliation claim, even assuming for the purposes that you do have a protected activity associated with her opposition to the activity that was occurring involving Yukari Murakami or any of the other issues out there, even assuming that Jura has triggered that protected activity, you cannot say that Cosgarden had any involvement with the subsequent adverse employment action. And similarly, you cannot say as to any malice. Thank you, Your Honor. Thank you. Now, we took you over time. Let's give you two minutes back on the clock. You have any evidence of Ms. Cosgarden's involvement in the decision to terminate? Yes. We have evidence of that, and that's essentially the fact that she was the one who took after Jerry Jura from the schedule and was her immediate supervisor. She had to know about it, and she had to be involved in this. She had to. I understand your contention about changing the schedule, but let's talk about the termination. What's the evidence that Ms. Cosgarden was involved in the termination, other than the fact that she must have been? She was participating in these management meetings. Was she at a meeting where a decision was made to terminate your client? Presumably she was. I'm sorry. I didn't hear that. Presumably she was. Presumably? That's not evidence. They wouldn't admit. Defenders wouldn't admit anything like that. So they have a declaration, opposing counsel said, by Mr. Acobe saying she was not. And so did she put in, did you put in any evidence contradicting that, or are you relying just on the inference? Relying on the inference. Thank you. I just wanted to address the issues that were raised. I think the most important issue is whether this was, in fact, Title VII violation, conduct of Marie Cosgarden towards Jackie Jura. And, of course, this is not an issue of personal relation and personal animosity type of issue. This is sexual harassment. The case right on point is Onkale case where there was also same-sex sexual harassment. Well, they were putting their sexual organs on him and things like that. I mean, that seems pretty different than this case. Why shouldn't we look at McConnell, even though it's an unpublished, out-of-circuit case? In McConnell, for example, the situation was that the person who alleged the discrimination was a supervisor, was a third person. And she basically just stated that the supervisor didn't like that other employee because there was some soured personal relation. But there's no allegation that there was any actual sexual harassment. There's no details about what they did, but presumably the supervisor just didn't favor the employee. And that's really what happened in all these other cases that are cited. In this case, there is evidence of day-to-day questions about sexual conduct, whether you've had sex with this person, whether you slept with this person, whether you kissed that person, and there was an outbreak. All right. Now, I just want to ask, with respect to Robert Rivera's belief that it was discrimination, with the court permission, I'd like to submit just pages from his deposition or from the excerpt of records where he testifies that this was his belief and that was the basis for his EEOC complaint that he filed after he was terminated. It's in the record? It is in the record. It's not that he didn't believe it was discrimination. And you pointed us to those pages in the record in your briefs? Yes. I'd like to submit just... Okay. Good. Thank you. They may not be in the brief, but I want to submit them post-argument. But they're already in the deposition that's already in the record in front of us? Yes. In the excerpts from the record. Yeah. Well, there's nothing more that you need to submit because we already have it. Yes. If the court were... Because there's voluminous, you know, depositions. We've got law clerks who read very carefully. All right. Okay. Thank you very much. Thank both sides for your arguments. The case, Rivera v. County of Maui, now submitted for decision.
judges: FLETCHER, IKUTA, HURWITZ